Kirsten D. Gerbatsch (MT Bar No. 68806756)
Wesley James Furlong (MT Bar No. 42771409)
NATIVE AMERICAN RIGHTS FUND
745 West 4th Avenue, Suite 502
Anchorage, AK 99501
Tel. (907) 276-0680
gerbatsch@narf.org
wfurlong@narf.org

Jacqueline De León (*pro hac vice* forthcoming)
Malia Gesuale (*pro hac vice* forthcoming)
NATIVE AMERICAN RIGHTS FUND
250 Arapahoe Avenue
Boulder CO, 80302
Tel. (303) 447-8760
jdeleon@narf.org
gesuale@narf.org

Samantha Blencke (*pro hac vice* forthcoming)
NATIVE AMERICAN RIGHTS FUND
950 F Street Northwest, Suite 1050
Washington, DC 20004
Tel. (202) 785-4166
blencke@narf.org

Theresa J. Lee (*pro hac vice* forthcoming)
Sophia Lin Lakin (*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street
New York, NY 10004
Tel. (212) 549-2500
tlee@aclu.org

Alex Rate (MT Bar No. 11226)
ACLU OF MONTANA
P.O. Box 1968
Missoula, MT 59806
Tel. (406) 224-1447
ratea@aclumontana.org

*Counsel for Plaintiffs*

i

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION**

| | |
|---|---|
| CHIPPEWA CREE INDIANS OF THE ROCKY BOY'S RESERVATION; TANYA SCHMOCKEL; and KEN MORSETTE, <br><br> Plaintiffs, <br><br> v. <br><br> CHOUTEAU COUNTY, MONTANA; CHOUTEAU COUNTY BOARD OF COUNTY COMMISSIONERS; CLAY REIHL, in his official capacity as Chouteau County Commissioner; ROBERT PASHA, in his official capacity as Chouteau County Commissioner; RICK DARLINGTON, in his official capacity as Chouteau County Commissioner; and LANA CLAASSEN, in her official capacity as Chouteau County Clerk and Recorder, <br><br> Defendants. | Case No. CV-25-69-GF-BMM <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Pursuant to 42 U.S.C. § 1983 and 52 U.S.C. § 10301, the Chippewa Cree Indians of the Rocky Boy's Reservation, Tanya Schmockel, and Ken Morsette (collectively, "Plaintiffs") bring this Complaint against Chouteau County, Montana (the "County"); the Chouteau County Board of County Commissioners (the "Board of Commissioners"); Chouteau County Commissioners Clay Reihl, Robert Pasha, and Rick Darlington, in their official capacities; and Chouteau County Clerk and

1

Recorder Lana Claassen, in her official capacity (collectively, "Defendants"), and allege as follows.

## INTRODUCTION

1.      Plaintiffs Chippewa Cree Indians of the Rocky Boy's Reservation (the "Chippewa Cree Tribe" or the "Tribe") and its members Tanya Schmockel and Ken Morsette, registered Chouteau County voters, challenge the Board of Commissioners' current election system, which violates Native Americans' voting rights. The system impermissibly dilutes the Native American vote by requiring that all County commissioners be elected on an at-large basis—*i.e.*, by all voters across the County—rather than by the voters in single-member voting districts where the candidates must reside.

2.      Defendants' conduct violates Section 2 of the Voting Rights Act. By conducting at-large elections for commissioner seats, Defendants deprive Native American voters of a full and equal opportunity to elect a candidate of their choice to the Board of Commissioners. Defendants' actions have the effect of artificially suppressing the ability of Native Americans to participate equally in the electoral process in the County.

3.      To remedy Defendants' violations of the Voting Rights Act, Plaintiffs seek a declaratory judgment and an injunction that prohibit Defendants from continuing to use their at-large election system and requiring, instead, the

implementation of three single-member voting districts, including at least one single-member commissioner district in which Native American voters would have the opportunity to elect their candidate of choice.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 1357, 1362, 2201(a), and 2202; 42 U.S.C. § 1983; 52 U.S.C. § 10308(f); and Federal Rules of Civil Procedure 57 and 65.

5.    This Court has personal jurisdiction over Defendants all of whom reside in Chouteau County, which is located within the District of Montana.

6.    Venue is proper in this Court under 28 U.S.C. §§ 106 and 1391(b).

## PARTIES

<u>Plaintiffs</u>

7.    Plaintiff CHIPPEWA CREE INDIANS OF THE ROCKY BOY'S RESERVATION is a federally recognized Indian Tribe.

8.    The Tribe has 7,367 enrolled members, about 4,122 of whom live on or adjacent to the Rocky Boy's Reservation ("the Reservation").

9.    The Chippewa Cree Tribe is located on the Reservation in north-central Montana. The Reservation overlaps with Chouteau and Hill Counties.

10.    The current electoral system robs Native American voters of a meaningful voice on the Chouteau County Commission by denying Native

3

American voters the ability to elect a candidate of choice that is responsive to Tribal needs. This denial undermines the Tribe's political power and violates the rights of its members as citizens of Chouteau County and the United States.

11.     The Tribe brings this suit on its own behalf to protect its sovereign interests, and as *parens patriae* to protect its members' statutory and constitutional rights and health and welfare through the prevention of future violations of their rights.

12.     Plaintiff TANYA SCHMOCKEL is Native American and an enrolled member of the Chippewa Cree Tribe.  She resides in Board of Commissioners residency District 1, which overlaps with the Reservation in Chouteau County. Ms. Schmockel votes in Chouteau County elections.

13.     Plaintiff KEN MORSETTE is Native American and an enrolled member of the Chippewa Cree Tribe.  He resides in Board of Commissioners residency District 1, which overlaps with the Reservation in Chouteau County.  Mr. Morsette votes in Chouteau County elections.

Defendants

14.     Defendant CHOUTEAU COUNTY is a political subdivision of the State of Montana. The County may sue and be sued in its own name. § 7-1-2103(1), MCA.

4

15.    Defendant CHOUTEAU COUNTY BOARD OF COUNTY COMMISSIONERS is the governing body of Chouteau County established under the laws of Montana. § 7-1-2104, MCA. The Board of Commissioners administers the legislative and executive powers of the County and is responsible for adopting the requirements governing the election of its members.

16.    Defendants RICK DARLINGTON, CLAY REIHL, and ROBERT PASHA are sued in their official capacities as the current members of the Board of Commissioners. They represent residency Districts 1, 2, and 3, respectively. On information and belief, each of these Defendants are residents of Chouteau County. Because the Commissioners have a direct and ongoing responsibility for administering the challenged election system, § 7-4-2102, MCA, and because State law allows counties to implement districted commissioner elections if "provided for under a court order[,]" § 7-4-2104(1)(b), MCA, their inclusion in their official capacity ensures that any injunctive or declaratory relief granted by this Court will be binding on them and their successors in office and is necessary to effectuate complete relief under Section 2 of the Voting Rights Act.

17.    Defendant LANA CLAASSEN is sued in her official capacity as the Chouteau County Clerk and Recorder (the "County Clerk"). In that capacity, she is in charge of administering elections for the County. § 13-1-301, MCA. On information and belief, Defendant Claassen is a resident of Chouteau County.

5

**LEGAL BACKGROUND**

18.    Section 2 of the Voting Rights Act prohibits any "standard, practice, or procedure" that "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 52 U.S.C. § 10301(a). A violation of Section 2 is established if it is shown that "the political processes leading to [a] nomination or election" in the jurisdiction "are not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b).

19.    The United States Supreme Court has "long recognized that . . . at-large voting schemes may 'operate to minimize or cancel out the voting strength of racial [minorities in] the voting population.'" *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986) ("*Gingles*") (quoting *Burns v. Richardson*, 384 U.S. 73, 88 (1966)); *see Allen v. Milligan*, 599 U.S. 1 (2023) (reaffirming *Gingles*).

20.    In *Gingles*, the Supreme Court identified three necessary preconditions ("the *Gingles* preconditions") for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the

6

majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50–51.

21.     After the preconditions are established, the statute directs courts to assess whether, under the totality of the circumstances, members of the racial minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. 52 U.S.C. § 10301(b).

22.     In *Gingles*, the Supreme Court directed that courts must consult the Senate Report on the 1982 amendments to the Voting Rights Act for its non-exhaustive factors (the "Senate Factors"). 478 U.S. at 43–44. Courts should consider if, in the totality of circumstances in the jurisdiction, the operation of the electoral device being challenged results in a violation of Section 2. *Id.*

23.     The Senate Factors include: (1) the history of official voting-related discrimination in the state or political subdivision; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group; (4) the exclusion of members of the minority group from candidate slating processes; (5) the extent to which the minority group bears the effects of discrimination in such areas as education, employment, and health, which hinder

their ability to participate effectively in the political process; (6) the use of overt or subtle racial appeals in political campaigns; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a lack of responsiveness on the part of elected officials to the particularized needs of minority group members; and (9) where the policy underlying the state or political subdivision's use of the challenged standard, practice, or procedure is tenuous. *Id.* at 36–37; *see also* S. Rep. No. 97-417, at 28–29 (1982).

24.    "[T]his list of typical factors is neither comprehensive nor exclusive." *Gingles*, 478 U.S. at 45. "There is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." S. Rep. No. 97-417, at 29. Rather, "the question whether the political processes are 'equally open' depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Gingles*, 478 U.S. at 45 (quoting S. Rep. No. 97-417 at 30).

## FACTS

### A.    CHOUTEAU COUNTY

25.    Chouteau County is located in north-central Montana.

26.    In its northeast corner, the County overlaps with approximately a third of the Reservation.

27.    According to the 2020 Census, the County has a total population of 5,895, of whom 4,172 (70.77%) are non-Hispanic White, 1,521 (25.80%) are Native American[1] alone or in combination, and 202 (3.43%) are some other race.

28.    According to the 2020 Census, the County has a voting-age population ("VAP") of 4,346, of whom 3,319 (76.37%) are non-Hispanic White, 900 (20.71%) are Native American alone or in combination, and 127 (2.92%) are some other race.

29.    The 2020 Census demographics for the County are represented in Figure 1.

…

…

…

…

…

…

…

…

---

[1] The U.S. Census Bureau's official term for what is commonly referred to as the *Native American voting-age population* is "American Indian and Alaska Native" ("AIAN"), as defined by the Office of Management and Budget ("OMB") and used in Census data products, including *Citizen Voting-Age Population by Race and Ethnicity* ("CVAP") tables.

**Figure 1. Chouteau County Population (2020 Census).**

|  | Total Population | | Voting-Age Population | |
| --- | --- | --- | --- | --- |
| Native American and Alaska Native (Alone or In Part) | 1,521 | 25.80% | 900 | 20.71% |
| Non-Hispanic White (Alone) | 4,172 | 70.77% | 3,319 | 76.37% |
| Some Other Race | 202 | 3.43% | 127 | 2.92% |
| Total | 5,895 | | 4,346 | |

Source: U.S. Census, 2020 Census Redistricting Data (Pub. L. No. 94-171) Summary Files, Chouteau County, Montana, Tables P1 & P3.

30.    The vast majority of the Native American VAP of Chouteau County is concentrated in the northeastern portion of the County, where the Reservation is located.

31.    According to the U.S. Census Bureau's 5-year estimates, the Reservation population is over 95% Native American.

32.    Figure 2 is a choropleth-shaded map depicting the concentration of the Native American VAP in Chouteau County by Census County Division, according to the 2020 Census. County subdivisions with darker colors indicate a higher

10

Native American VAP. County subdivisions with lighter colors indicate a smaller

Native American VAP.

**Figure 2. American Indian and Alaska Native Voting-Age Population in Chouteau County (2020 Census).**



Source: U.S. Census, 2020 Census Redistricting Data (Pub L. No. 94-171) Summary Files, Race for Population 18 Years and Over, Table P3, American Indian Alaska Native alone.

## B.    CHOUTEAU COUNTY BOARD OF COMMISSIONERS

33.    The Board of Commissioners is elected at-large from three residency

districts.

34.    Montana State law requires that "[i]n each county of the state,

following each federal decennial census, the board of county commissioners shall

divide their respective counties into as many commissioner districts as there are county commissioners and ensure that the districts are as compact and equal in population and area as possible." § 7-4-2102(1), MCA.

35.    "A person may not be elected as a member of a board of county commissioners unless the person has resided in the county and the district for at least 2 years immediately preceding the general election." § 7-4-2104(2), MCA.

36.    Commissioners are elected to six-year terms. Commissioners' terms are staggered so that one residency district is up for election every two years. § 7-4-2105, MCA.

37.    State law requires that all county commissioners in all Montana counties are elected at-large, meaning that all registered voters in a county may vote in every commissioner election regardless of whether the voters reside in a commissioner's residency district. § 7-4-2104, MCA.

38.    State law allows counties to implement districted commissioner elections if "provided for under a court order." § 7-4-2104(1)(b), MCA.

39.    Where a statute requires at-large elections, and those elections dilute minority voting power in violation of Section 2, federal law prevails, and the at-large system must yield to the protections of the Voting Rights Act. *See United States v. Blaine Cnty.*, 363 F.3d 897 (9th Cir. 2004).

40.     On November 14, 2023, the Tribe notified the Board of Commissioners that its at-large method of election violates Section 2, detailing in correspondence how each of the three *Gingles* preconditions are met and that under the totality of circumstances the County's election method results in Native Americans having less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Explaining that Montana state law requires at-large elections unless a court orders otherwise, the Tribe stated its letter to the Board, "in the spirit of cooperation, and in order to avoid unnecessary expense to the County's taxpayers," offered "to work with the County to develop a stipulated consent decree and district map that complies with the VRA, and which can be jointly submitted to the Montana federal district court for approval."

41.     On December 5, 2023, legal counsel for the Tribe met with the Board of Commissioners, the County Clerk, and the County attorney regarding the Tribe's proposal and to discuss a simple resolution of converting its residency districts into single-member electoral districts. The Tribe's counsel followed up with the Board of Commissioners via email on December 11, 2023, and January 19, 2024.

42.     To date, the County has not responded to the Tribe's proposal.

43.     The lack of response from the County makes court intervention necessary.

44.     The elections for the Board of Commissioners are partisan, and primary elections are held to determine which candidates advance to the general election.

45.     Figure 3 is the Board of Commissioners residency district map provided to the Tribe by the County pursuant to a public records request made on November 14, 2023, and records received on December 5, 2023, and January 29, 2024.

**Figure 3. Board of Commissioners Residency District Map (Handwriting in Original Provided by County).**



46.     Residency District 1 is shaded blue and located in the northeastern part of the County. Residency District 2 is shaded green and located in the western part of the County. Residency District 3 is shaded purple and located in the southern part of the County. Residency District 1 encompasses the portion of the County that overlaps with the Reservation.

47.     The position for Board of Commissioner for residency District 1 is up for election in 2026.

48.     Candidates for the Board of Commissioners have run uncontested in every general election since at least 2014.

### C.     VOTE DILUTION: THE *GINGLES* PRECONDITIONS

49.     Native Americans' voting strength in Chouteau County is diluted by the at-large election scheme for the Board of Commissioners in violation of Section 2 of the Voting Rights Act.

50.     The Supreme Court in *Gingles* identified three necessary preconditions (the *Gingles* preconditions) for a claim of vote dilution under Section 2 of the Voting Rights Act: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote

15

"sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50–51.

51.    Native Americans in the County are sufficiently numerous and geographically compact to constitute a majority of the voting-age population in one single-member district. This is shown in Figure 4, an illustrative three-district plan for electing members of the Board of Commissioners. Figure 5 shows the illustrative map's population statistics. *Gingles* precondition number one is satisfied.

**Figure 4. Illustrative Three-District Single-Member Plan.**



16

**Figure 5. Population Statistics for Illustrative Three-District Single-Member Plan.**

|  | Illustrative District 1 | Illustrative District 2 | Illustrative District 3 | Total |
|---|---|---|---|---|
| Population | 1,954 | 1,967 | 1,974 | 5,895 |
| Population Deviation | -0.56% | 0.10% | 0.46% | 1.02% |
| Total VAP | 1,235 | 1,543 | 1,568 | 4,346 |
| Non-Hispanic White VAP | 33.04% | 94.23% | 92.92% | 76.37% |
| Native American VAP | 64.94% | 3.11% | 3.19% | 20.71% |

52. Native Americans in the County are politically cohesive, having voted for the Native American candidate of choice over other candidates preferred by non-Hispanic White voters in every general partisan state and federal election since 2014. *Gingles* precondition number two is satisfied.

53. For example, in the 2024 Governor's race, approximately 87% of ballots cast by Native Americans in Chouteau County were for Ryan Busse, compared to 23.2% of ballots cast by non-Hispanic White voters in the County. In the 2024 general election for Montana Attorney General, approximately 97% of ballots cast by Native Americans in Chouteau County were for Ben Alke,

17

compared to approximately 25% of ballots cast by non-Hispanic White voters in the County. In the 2024 U.S. Senate race, about 99% of ballots cast by Native Americans in Chouteau County were for Jon Tester, compared to roughly 37% of ballots cast by non-Hispanic White voters in the County.

54. In the 2022 U.S. House of Representatives race, approximately 87% of ballots cast by Native Americans in Chouteau County were for Penny Ronning, compared to approximately 15% of ballots cast by non-Hispanic White voters in the County.

55. In the 2020 general election for Montana Attorney General, almost 100% of Native American ballots in Chouteau County were cast for Raph Graybill, compared to approximately 27% of ballots cast by non-Hispanic White voters in the County. In the Governor's general election race that same year, approximately 94% of ballots cast by Native Americans in Chouteau County were in favor of Mike Cooney, compared to approximately 28% of ballots cast by non-Hispanic White voters in the County.

56. The non-Hispanic White majority in Chouteau County votes sufficiently as a bloc to enable it—in the absence of special circumstances— usually to defeat the candidates preferred by Native Americans in the County. *Gingles* precondition number three is satisfied.

57.    The Native American preferred candidate lost in Chouteau County in all but one election since 2014.

58.    The single contest in which the plurality of non-Hispanic White voters supported the Native American preferred candidate was a non-partisan election for State Supreme Court Justice.

### D.    VOTE DILUTION: TOTALITY OF THE CIRCUMSTANCES

59.    In addition to the three *Gingles* preconditions, the totality of the circumstances support Plaintiffs' claim that Native Americans in the County have less opportunity than other members of the electorate to participate in the electoral process and elect Board of Commissioners candidates of their choice, in violation of Section 2 of the Voting Rights Act.

60.    There is a long and well documented history of voting discrimination against Native Americans in Montana.

61.    As soon as the Territory of Montana was established, it passed a law limiting voting to "white male citizens." *Acts, Resolutions and Memorials of the Territory of Mont., Passed by the First Legislative Assembly*, at 375 (1864), https://books.google.com/books?id=M7AwAQAAMAAJ&pg=PA713&source=gbs _toc_r&cad=2#v=onepage&q&f=false.

62.    The new Territory also adopted explicit prohibitions on Native American voters. Territorial law in 1871 prohibited establishing voting precincts

19

"on any Indian reservations whatsoever." Orlan J. Svingen, *The Northern Cheyenne Indian Reservation 1877-1900*, at 269 (2002 ed.).

63.    The 1889 Montana Enabling Act specified that the State's constitution must be "republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed." Act of Feb. 22, 1889, ch. 180 § 4, 25 Stat. 676 (1889).

64.    The State of Montana continued to deny Native Americans their right to vote even after Congress extended the franchise to Native Americans in the Indian Citizenship Act of 1924, Pub. L. No. 68-175, 43 Stat. 253 (1924) (codified at 8 U.S.C. § 1401(b)).

65.    In 1932, the Montana Constitution was amended to limit voting to taxpayers, unless the non-taxpaying voters were citizens at the time of statehood. MONT. CONST. art. IX, § 2. Native Americans were not considered citizens at the time of Montana's statehood in 1889. This amendment, therefore, served to continue the disenfranchisement of Native American voters. Various other laws were enacted as late as 1963 to limit voting to state taxpayers in Montana. *See Blaine Cnty.*, 363 F.3d at 913 ("[B]eginning in 1932 and continuing through 1963, the Montana legislature enacted various laws limiting voting to taxpayers, which served to disenfranchise many reservation residents").

66.    Official discrimination in voting persists today in Montana.

20

67.     In *Western Native Voice v. Stapleton*, the Thirteenth Judicial District Court for Yellowstone County permanently struck down the Montana Ballot Interference and Protection Act ("BIPA"), a law that imposed criminal penalties for individuals who collected more than six mail-in ballots.  No. DV-2020-377 (Mont. Dist. Ct. Sept. 25, 2020). The court found that the BIPA disparately impacted Native Americans in Montana, many of whom live on remote reservations and thus rely heavily on ballot collections to cast their ballots at all. It also noted that this burden was exacerbated by the fact that, due to many Native American communities' geographic isolation and high rates of poverty, Native American voters were less able than other Montanans to use alternative methods of voting not impacted by the BIPA's constraints. The court held that the BIPA violated Native Americans' fundamental right to vote under Article II, Section 13 of the Montana Constitution.

68.     Just two years later, a Montana state court struck down as unconstitutional two state laws that hinder Native American participation in the State's electoral process. *Mont. Democratic Party v. Jacobsen*, No. DV 21-0451, 2022 WL 16735253 (Mont. Dist. Ct. Sept. 30, 2022).  Montana House Bill 176 ("HB 176") eliminated Election Day registration, which reservation voters disproportionately rely upon to cast votes in Montana. Mont. H.B. 176, 67th Leg., 1st Sess. (2021). Montana House Bill 530—a law similar to the BIPA previously

held unconstitutional—prohibited paid third-party ballot assistance, a service that aids Native American voters living on reservations. Mont. H.B. 530, 67th Leg., 1st Sess. (2021). The court ruled that the laws violated provisions of the Montana Constitution, including the right to vote, equal protection, free speech, and due process. In 2024, the Montana Supreme Court held that the two state laws violate the fundamental right to vote under the Montana Constitution. *Mont. Democratic Party v. Jacobsen*, 545 P.3d 1074 (Mont. 2024), *cert. denied* 145 S. Ct. 1125 (2025).

69.    Undeterred, in 2025, the Montana Legislature passed another law, Montana Senate Bill 490 ("SB 490") that restricts voter registration by eliminating eight critical hours of registration opportunity on Election Day. S.B. 490, 69th Leg., Reg. Sess. (Mont. 2025) (enacted May 5, 2025).  SB 490 harms Native Americans in rural Tribal communities across Montana's seven Indian reservations by restricting access to the voter registration process. Barely a year after the Montana Supreme Court ruled that similar laws restricting Election Day registration unconstitutionally burdened Native Americans' right to vote, and despite the State's own legal analysis indicating that the proposed legislation likely violates the Montana Constitution, the Legislature nevertheless enacted this latest law disenfranchising Native American voters.  This is the third time in six years that Tribal communities have been forced to seek redress from the courts for the

22

Legislature's continued insistence on making it more difficult for Native Americans in Montana to vote.  The law is being challenged by Tribes and Tribal members across the State. Mot. to Intervene, *Mont. Fed'n of Pub. Emps. v. Montana*, No. DV-25-268 (Mont. Dist. Ct. June 24, 2025).

70.    Tribal members have inequitable access to voting services. Voters in Fort Benton, Montana, the Chouteau County seat, can access full early voting services Monday through Friday, eight hours per day.  However, Fort Benton is approximately a fifty-mile one-way drive for voters living on the Reservation in Chouteau County.  In contrast, the County provides only limited access for early voting via a satellite office on the Reservation—for example, the County's satellite office for early voting during the 2024 General Election was open only three days.

71.    Montana has a long history of diluting the vote of Native American voters through the deployment of at-large election schemes at the county level. *See Windy Boy v. Cnty. of Big Horn*, 647 F. Supp. 1002, 1023–24 (D. Mont. 1986) (holding that at-large election system for county commission violated Section 2 of the Voting Rights Act by diluting Native American voting strength and ordering creation of single-member districts); *United States v. Roosevelt Cnty.*, No. 00-50-BLG-JDS (D. Mont. Mar. 24, 2000) (consent decree resolving Section 2 claim alleging at-large elections diluted Native American voting power; required county to adopt remedial plan including single-member districts); *Blaine Cnty.*, 363 F.3d at

23

916 (affirming district court's finding that at-large election system for county commission violated Section 2 by diluting Native American voting strength and rejecting equal protection challenge to the Voting Rights Act).

72.    Elections in Chouteau County exhibit characteristics of overwhelming racial polarization.

73.    The use of at-large voting for the Board of Commissioners tends to enhance the opportunity for discrimination.  This system allows the white majority in Chouteau County to control the outcome of every commissioner election and prevents Native American voters—who are geographically concentrated in and around the Rocky Boy's Reservation in the northeast portion of the county—from electing candidates of their choice.

74.    Because Commissioners' terms are staggered and only one seat is up at a time, there is no opportunity for cumulative or proportional influence in multi-seat elections, further enhancing the opportunity for discrimination against Native American voters.

75.    The County also limits access to election services for Native American voters by providing only minimal in-person opportunities on the Reservation; for example, during the 2024 General Election, the County's satellite office on the Rocky Boy's Reservation was open for only three days during the early voting period.

24

76.     To Plaintiffs' knowledge, no Native American has been elected to the Board of Commissioners nor to any other county-wide office for at least the past ten years.

77.     Native Americans in Montana and Chouteau County continue to bear the effects of state and federal discrimination. Native Americans have a lower socioeconomic status and lag behind non-Hispanic White residents in a wide range of areas, including employment, income, education, and access to health care.

78.     According to the U.S. Census Bureau's 2023 American Community Survey, the poverty rate on the Reservation is 37.1%,[2] compared to 7.1% statewide and 3% in Chouteau County.

79.     According to the 2023 American Community Survey, the percentage of Native Americans on the Reservation who have completed a post-secondary education (14.5%) is less than the overall rate of Chouteau County residents (22.6%) and all Montana residents (34.5).[3]

---

[2] U.S. Census Bureau, *2019-2023 American Community Survey 5-Year Estimates*, at Table S1702, https://data.census.gov/table/ACSST5Y2023.S1702?q=poverty+Chouteau+County,+Montana&g=040XX00US30.
[3] U.S. Census Bureau, *2019-2023 American Community Survey 5-Year Estimates*, Table S1501, https://data.census.gov/table/ACSST5Y2023.S1501?q=s1501+Chouteau+County,+Montana&g=040XX00US30.

80. According to data released by the Montana Governor's Office, as of August 2023, Indian reservations in Montana have unemployment rates ranging from 3.3% to 8.8%. That range is between 132% and 352% of the State unemployment rate of 2.5%.  The unemployment rate on the Reservation (8.8%) was higher than Chouteau County as a whole (3.1%), higher than any county, and higher than all other reservations.

81. The effects of discrimination on Native Americans' education, employment, and health hinder their ability to participate effectively in the political process.

82. The County has been unresponsive to the particularized needs of Tribal members.

83. To Plaintiffs' knowledge, the County has never consulted the Chippewa Cree Tribal Council on policy decisions that affect the Tribe.

84. The County does not hear or respect Native American voices and makes decisions unilaterally.

85. On the Reservation, voters like Ms. Schmockel feel ignored and marginalized by County and State officials. Native American residents feel like they are treated like an afterthought in election administration and there is a lack of consistent outreach.

26

86.     Mr. Morsette has witnessed election officials creating unnecessary burdens on Native American voters.

87.     Native American voters are frequently targeted by County law enforcement, particularly during high-traffic events like basketball tournaments in Great Falls. According to Mr. Morsette, Tribal members are regularly stopped by patrol officers from Chouteau County, who "sit on the edge of town and wait to catch Indians," including in Big Sandy, a majority-white town near the reservation.

88.     In the County, Tribal members, including Ms. Schmockel and Mr. Morsette, face persistent racism and discrimination from non-Native community members. Native Americans are often treated as second-class citizens, subjected to open hostility, public ridicule and mockery, stereotyped in social spaces, targeted by racial slurs and exclusion, profiled in stores, ignored in public, and denied equitable treatment in civic life. Tribal members are frequently labeled as dishonest, unemployed, or criminal by local white residents. These racially charged interactions are not isolated and reflect deep-seated prejudice. Such racial hostility and alienation contribute to a broader context of official discrimination and community division that discourages Native American participation in the political process and supports the presence of racially polarized voting and systemic inequality.

89.     In 2005, the U.S. Department of Justice initiated mediation efforts to address racial tensions between the Chippewa Cree Tribe and non-Native institutions, including law enforcement, in Chouteau's neighboring county. *Havre Racism Story Prompts Mediation*, Billings Gazette (Mont.), June 30, 2005, at 1, https://www.havredailynews.com/story/2005/08/04/local/local-leaders-share-views-with-federal-mediator/461798.html. Native American residents in Chouteau County remain concerned about unequal treatment by police, government indifference, and widespread community bias—factors that contribute to disenfranchisement and alienation from political and civic life. The need for federal intervention underscores a longstanding and unresolved climate of discrimination that continues to affect Native American residents' access to and trust in local political processes.

## CLAIM FOR RELIEF
### Discriminatory Effect in Violation of Section 2 of the Voting Rights Act
### 52 U.S.C. § 10301, 42 U.S.C. § 1983

90.     Plaintiffs repeat and re-allege the allegations contained in all of the paragraphs above as if fully set forth herein.

91.     52 U.S.C. § 10301 and 42 U.S.C. § 1983 authorize suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

28

92. Section 2 of the Voting Rights Act prohibits the enforcement of any qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any United States citizen to vote on account of race or color or because they are a member of a language minority group. 52 U.S.C. § 10301(a).

93. The Native American population in Chouteau County is sufficiently numerous and geographically compact to allow them to constitute an effective voting majority of the VAP for one of three properly apportioned, single-member districts for electing members of the Board of Commissioners.

94. The Native American voters in the County are politically cohesive, and elections in the County show a clear pattern of racially polarized voting, in which the non-Hispanic White population of the County historically and currently votes sufficiently as a bloc to enable it usually to defeat Native Americans' preferred candidate.

95. These facts satisfy the three *Gingles* preconditions.

96. The totality of the circumstances establishes that the current at-large election scheme for the Board of Commissioners has the effect of denying Native American voters an equal opportunity to participate in the political process and to elect representatives of their choice, in violation of Section 2 of the Voting Rights Act. 52 U.S.C. § 10301.

29

97. By engaging in the acts and omissions alleged herein, Defendants deny Plaintiffs' rights guaranteed to them by Section 2 of the Voting Rights Act and will continue to violate those rights absent relief granted by this Court.

98. Because Mont. Code Ann. § 7-4-2104 requires commissioners to be elected at-large, "unless otherwise provided for under: . . . (b) a court order[,]" Plaintiffs seek a court order permanently enjoining Defendants from conducting at-large elections in violation of Section 2 of the Voting Rights Act.

99. Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Board of Commissioners using the current, unlawful at-large election scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Assume jurisdiction over this case;

2. Declare that the current at-large method of electing Chouteau County Commissioners dilutes Native American voting strength in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and in violation of 42 U.S.C. § 1983;

3. Permanently enjoin Defendants from conducting Commissioner elections in a manner that fails to comply with the United States Constitution and Section 2 of the Voting Rights Act;

30

4.    Order Defendants to implement compliant elections under a redistricting plan that provides at least one Native American voting-age majority single-member commissioner district that effectively performs for the Native American candidate of choice;

5.    Award Plaintiffs the costs of this action together with their reasonable attorneys' fees and expenses under 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e);

6.    Retain jurisdiction of this action under 52 U.S.C. § 10302(c) for such period as the Court deems appropriate under the circumstances; and

7.    Grant Plaintiffs any further relief which the Court deems warranted and proper.

Dated: August 14, 2025        Respectfully submitted,

*/s/ Kirsten D. Gerbatsch*
*/s/ Wesley James Furlong*
Kirsten D. Gerbatsch (MT Bar No. 68806756)
Wesley James Furlong (MT Bar No. 42771409)
Jacqueline De León (*pro hac vice* forthcoming)
Malia Gesuale (*pro hac vice* forthcoming)
Samantha Blencke (*pro hac vice* forthcoming)
NATIVE AMERICAN RIGHTS FUND

Theresa J. Lee (*pro hac vice* forthcoming)
Sophia Lin Lakin (*pro hac vice* forthcoming)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

*/s/ Alex Rate*

31

Alex Rate (MT Bar No. 11226)
ACLU OF MONTANA

*Counsel for Plaintiffs*